**EXHIBIT 8**

Building Permits and Certificates of Occupancy for 66 Leo's Lane, where the new owners destroyed a tiny ranch and put up a giant McMansion instead, aided, of course, by defendant ELBERT W. ROBINSON who pushed the application through the ARB and the Building Dept., for which he is the Village Attorney.

# Village of Southampton, N.Y.

# Building Permit

### *Subject to Any Federal or State Regulations*

**Permit No:** 10522

**S.C. Tax # 904:** 14 - 1 - 91

**Date:** September 14, 2011

**Issued to:** COSTAS & AFRODITI LAGGIS

**Address:** 80 ROMAN ROAD, SOUTHAMPTON N.Y. 11968

**Type of Construction:** TWO-STORY SINGLE FAMILY DWELLING WITH COVERED FRONT PORCH, DEMOLITION OF EXISTING RESIDENCE                *HERS RATED*

**Location:** 66 LEOS LANE

**Cost of Construction:** $650,000.00

**FEES**

| | | |
|---|---|---|
| New: | $9,125.00 | |
| Addition: | | |
| Alteration: | | |
| Arb Fees: | $350.00 | |
| Fee Total: | $9,475.00 | |

*Received Payment From*

LAGGIS RE#1474 CK#24275 9-12-11

_____    THS

*Building Inspector*

*Treasurers Receipt*

**THIS PERMIT MUST BE KEPT ON THE PREMISE FOR WHICH IT IS ISSUED**

# Village of Southampton, N.Y.

# Building Permit

### *Subject to Any Federal or State Regulations*

**Permit No:** 10565

**S.C. Tax # 904:** 14-1-91

**Date:** November 16, 2011

**Issued to:** COSTAS & AFRODITI LAGGIS

**Address:** 66 LEOS LANE

**Type of Construction:** SWIMMING POOL

**Location:** 66 LEOS LANE

**Cost of Construction:** $14,000.00

**FEES**    **New:** $500.00

     **Addition:**

     **Alteration:**

     **Arb Fees:**

     **Fee Total:** $500.00

### *Received Payment From*

FARRELL BLDG. CK#25325 11-10-11

_____
           *Building Inspector*

### *Treasurers Receipt*

**THIS PERMIT MUST BE KEPT ON THE PREMISE FOR WHICH IT IS ISSUED**

# Village of Southampton, N.Y

No 12302

# CERTIFICATE OF OCCUPANCY

SCTM #904 14 - 1 - 91

Date 05/14/2012

THIS CERTIFIES that the building(S) located at:

66 LEO'S LANE

and upon the plot described upon the VILLAGE TAX ROLLS as follows;

LOT NO. 30
MAP OF ROSKO PLACE
FILED: JULY 28, 1960  FILE NO. 3211

conform(s) to all applicable provisions of the ZONING ORDINANCES of the Village of Southampton as amended to date. Same conform(s) substantially to the approved plans and specifications heretofore filled with this office and with the Application for the Building Permit, pursuant to which Building Permit

No. 10522

Date SEPTEMBER 14, 2011                          was issued.

THE OCCUPANCY FOR WHICH THIS CERTIFICATE IS ISSUED IS FOR
2 STORY SINGLE FAMILY RESIDENCE WITH ATTACHED GARAGE; FRONT
ENTRY PORCH & REAR WOOD DECK

THIS CERTIFICATE is issued to

LAGGIS & AFRODITI COSTAS

AS OWNER OF THE AFORESAID BUILDING(S).

Building Inspector

[The Certificate of Occupancy must be accompanied with a certified layout of premises and completed building structures, and will be issued only after the Building Inspector is convinced of the completion of the construction in compliance with the State Building Construction Code and with other laws, ordinances or regulations affecting the premise, and in conformity with the approved plans and specifications. A final electrical, plumbing, heating or sanitation certificate  or other evidence of compliance may be required before that issuance of the Certificate or Occupancy.]



**Village of Southampton, N.Y**

No 12303

# CERTIFICATE OF OCCUPANCY

SCTM #904 14 - 1 - 91                     Date 05/14/2012

THIS CERTIFIES that the building(S) located at:

66 LEO'S LANE

and upon the plot described upon the VILLAGE TAX ROLLS as follows;

LOT NO. 30
MAP OF ROSKO PLACE
FILED: JULY 28, 1960 FILE NO. 3211

conform(s) to all applicable provisions of the ZONING ORDINANCES of the Village of Southampton as amended to date. Same conform(s) substantially to the approved plans and specifications heretofore filled with this office and with the Application for the Building Permit, pursuant to which Building Permit

No. 10565

Date NOVEMBER 16, 2011                     was issued.

THE OCCUPANCY FOR WHICH THIS CERTIFICATE IS ISSUED IS FOR

SWIMMING POOL WITH PATIO

THIS CERTIFICATE is issued to

LAGGIS & AFRODITI COSTAS

AS OWNER OF THE AFORESAID BUILDING(S).

Building Inspector

[The Certificate of Occupancy must be accompanied with a certified layout of premises and completed building structures, and will be issued only after the Building Inspector is convinced of the completion of the construction in compliance with the State Building Construction Code and with other laws, ordinances or regulations affecting the premise, and in conformity with the approved plans and specifications. A final electrical, plumbing, heating or sanitation certificate or other evidence of compliance may be required before that issuance of the Certificate or Occupancy.]

K

# MEMORANDUM OF LAW
# IN OPPOSITION TO QUINTINS' MOTION TO DISMISS

Evelyn Konrad
200 East 84th Street
New York, New York 10028
212-585-1240
ek616367@cs.com

1.      *Hollman v. County of Suffolk*, (2011 U.S. Dist. LEXIS 8335, decided on January 31,

2011, E.D.N.Y.) distinguishes from the case at bar on several issues and especially on

the fact that the owner-defendants in the *Konrad v. Epley et al.* case acted in conspiracy

with a government defendant, Building Department and ARB attorney, ELBERT W.

ROBINSON JR. in fulfilling his wish, the wish of defendant mayor Epley and of former trustee's

wish to silence Plaintiff's voice opposing Village's illegal building program.  They shared the

wish to retaliate against Plaintiff for her opposition to the Epley administration's building plans,

and they also shared their personal vindictive and unjust enrichment motives against Plaintiff.

But three paragraphs from the *Hollman* decision written by Judge Bianco are applicable to

this *Konrad* case as well:

> In order to prevail on a federal civil rights action under Section 1983,
> a plaintiff must demonstrate: (1) the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws; (2) by a person
> acting under the color of state law. 42 U.S.C. § 1983. "Section 1983
> itself creates no substantive rights; it provides only a procedure for
> redress for the deprivation of rights established elsewhere." *Sykes v.
> James,* 13 F.3d 515, 519 (2d cir. 1993).  However, even if a plaintiff
> has adequately alleged a constitutional injury, a Section 1983 claim cannot
> be successful unless it can be demonstrated that such an injury was caused
> by a party acting under the "color of state law," and thus the central question
> is whether the alleged infringement of federal rights is "fairly attributable
> to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 102 S. Ct.
> 2744, 73 L.Ed.2d 482 (1982); *Wyatt v. Cole,* 504 U.S. 158, 161, 112 S. Ct.
> 1827, 118 L.Ed. 2d 504 (1992) ("The purpose of §1983 is to deter state

-1-

actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *Tancredi v. Metro Life Ins. Co.*, 316 F.3d 308, 312 (2d Cir. 2003) ("A plaintiff pressing a claim of violation of his constitutional rights under § 1983 is thus required to show state action.")

It is axiomatic that private citizens [*12] and entities are not generally subject to Section 1983 liability. See *Ciambriello v. County of Nassau,* 292 F.3d 307, 323-24 (2d Cir. 2002); *Reaves v. Dept. of Veteran Affairs*, No. 08-CV-1624 (RJD), 2009 U.S. Dist. LEXIS 523, 2009 WL 35074, at *3 (E.D.N.Y. Jan.6, 2009)("Purely private conduct is not actionable under § 1983, 'no matter how discriminatory or wrongful.'")(quoting *Am. Mfrs. Mut. Ins.Co. v. Sullivan*, 526 U.S. 40, 50, 119 S. Ct. 977, 143 L.Ed. 2d 130 (1999).   However, "the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state ("the compulsion test"); (2) when the state provides 'significant encouragement' to the entity, the entity is a willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with the state policies ('the joint action test' or 'close nexus test'); or (3) when the entity 'has been delegated a public function by the [s]tate,' ('the public function test')." *Sybalski v. Indep. Gr. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008)(citing *Brentwood Acad. V. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296, 121 S. Ct. 924, 148 L.Ed.2d 801 (2001); see also *Luciano v. city of N.Y.*, No. 09-CV-0539 ©, 2009 U.S. Dist. LEXIS 59202, 2009 WL 1953431, at *2 (S.D.N.Y., July 2, 2009) [*13] (stating that a private entity may only be considered a stte actor for the purposes of § 1983 if the private entity fulfills one of the "state compulsion," "public function," or "close nexus" tests); accord *Faraldo v. Kessler*, No. 08-CV-0261 (SJF), 2008 U.S. Dist. LEXIS 5367, 2008 WL 216608, at *4 (E.D.N.Y. Jan 23, 2008). "It is not enough, however, for a plaintiff to plead state involvement in "*some activity* of the institution alleged to have inflicted injury upon a plaintiff; rather, the plaintiff must allege that the state was involved *'with the activity that caused the injury'* giving rise to the action." *Sybalski*, 546 F.3d at 258 (citing *Schlein v. Miford Hosp. Inc.*, 561 F.2d 427, 428 (2d Cir. 1977) (emphasis in original). A plaintiff "bears the burden of proof on the state action issue." *Hedges v. Yonkers Racing Corp.*, 918 F.2d 1079, 1083 n.3 (2d Cir.1990), *cert. denied,* 499 U.S. 960, 111 S. Ct. 1583, 113 L.Ed. 2d 648 (1991).

## Joint Action or Compulsion Tests Reveal Common Unlawful Goal

2.    Let us pause before the 3rd paragraph from Judge Bianco's *Hollman* decision: since

defendants QUINTIN and the three government defendants already fulfill the "nexus test," in

that the Quintins' objective, to get Plaintiff out of their neighborhood so that their property can appreciate from other huge houses replacing small ranches and colonials like Plaintiff's, and that objective clearly coincides with that of defendant Mayor EPLEY and defendant PAUL ROBINSON, former trustee and now owner of eleven Village properties, as well as the objectives of defendant ELBERT W. ROBINSON Jr., who, as policy-maker, has been getting the ARB to approve as many applications for huge houses in the Rosko Place subdivision as come before it.

3.      In addition the QUINTINS also pass the "compulsion test," since, as lawyer for the Building Department and for the ARB, defendant ROBINSON not only controls the granting of their applications for the illegal pool house, the pergola and the stockade fence, but he also controls the Building Permits and Certificate of Occupancy which are issued by the Building Department.

4.      Defendant ROBINSON's active engineering of the attacks on Plaintiff, include his supplying defendant BROWN with attacks on Plaintiff's reputation that could only come from him, as for instance, in a letter he addressed to the Plaintiff and which defendant BROWN used as evidence against Plaintiff in his libel suit.

5.      Furthermore, while defendant WILLIAM BROWN claims to be acting pro se, he is not an attorney, and his papers are more than faintly reminiscent of the style used by defendant and attorney ELBERT W. ROBINSON JR., who has plenty of reason for staying in the background, but huge motivation in helping BROWN and getting him off the hot-seat, since BROWN's evidence would help prove the conspiracies entered into my ROBINSON against the Plaintiff.

6.      In the third paragraph Plaintiff is quoting herein from Judge Bianco's decision in the

-3-

*Hollman* case, Judge Bianco therein addresses the "joint action/comulsion tests' in some detail,

as follows:

> Under the 'joint action' doctrine, a private actor can be found "to
> act under color of state law for § 1983 purposes if. . . [the private
> party] is a willful participant in joint action with the State or its
> agents." *Dennis v. Sparks,* 449 U.S. 24, 27, 101 S. Ct. 183,
> 66 L.Ed.2d 185 (1980). "The touchstone of joint action is often
> a 'plan, prearrangement, conspiracy, custom or policy' [*26]
> shared by the private actor and the police." *Forbes,* 2008 U.S. Dist.
> LEXIS 63021, 2008 WL 3539936, at *5 (citing *Ginsberg v. Healey
> Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999). To
> establish joint action, "a plaintiff must show that the private citizen
> and the state official shared a common unlawful goal." *Bang v.
> Utopia Restaurant*, 923 F. Supp. 46, 49 (S.D.N.Y. 1996); se also
> *Burrell v. City of Mattoon,* 378 F. 3d 642, 650 (7th Cir. 2004) (under
> joint action requirement, plaintiff must show that "both public and
> private actors share a common, unconstitutional goal"). "However,
> generalized or conclusory allegations of conspiracies are insufficient
> to sustain a section 1983 claim, and complaints that lack further speci-
> ficity or 'specific instances of misconduct' are subject to dismissal."
> *Vazquez v. Combs,* No. 04-CV-4189 (GEL), 2004 U.S. Dist. LEXIS
> 22137, 2004 WL 2404224 , at *3 (S.D.N.Y. Oct. 22, 2004)(citing
> *Ciambriello v. Cnty of Nassau*, 292 F.3d 307, 324 (2d Cir. 2007)).

7.     The "common unlawful goal" is the easiest to prove in the *Konrad* case:   The Court need

only look at the following exhibits to the Amended Complaint to find how seriously defendant

ROBINSON takes his mission to convert all of the modest, middle-class properties in the Rosko

Place subdivision into McMansions:

> Exhibit 13:  defendant Robinson's fraudulent decision claiming that
> the Guerin property at 7 So. Rosko Drive is "adjacent to," and not part
> of the Rosko Place subdivision, contrary to Exhibit 6, showing the
> maps for all three sections of the Rosko Place subdivision, in combination
> conforming to the descriptive plat filed by Leo Rosko in 1956 (Exhibit 7).
>
> Exhibit 19: the deeds, including for Guerin's 7 So. Rosko Drive, compiled
> by Stewart Title Company, and showing both the Guerin and the Brown
> properties as being derived from the grantor-grantee index, from Leo Rosko.

8.     In addition, Exhibit 8 hereto, and attached as the last exhibit to the Affirmation in

Opposition to defendant QUINTINS' Motion to Dismiss shows the Building Permits and

Certificates of Occupancy of the enormous new and massive house at 66 Leo's Lane, which is

the newest McMansion added to the Rosko Place subdivision in 2012, and also shown in the

photographs which are Exhibit 1 to Plaintiff's Answer in Opposition to the Motion to Dismiss by

Epley et al.

9.      There is no light between defendant ROBINSON's unlawful goal of converting all the

lots in the Rosko Place subdivision to overbuilt McMansions, and the defendant-owners,

including the QUINTINS' goal of replacing all the tiny middle-class ranches in that subdivision

which devalue the QUINTIN property since they are owned, not by another hedge fund manager

like Donald Quintin, but by year-'round residents who are a retired plumber, a nurse, a doctor in

public practice, and others satisfied with their one house, rather than a second-home like the

QUINTINS.

10.     In yet another case, *Clyde J. Jennings, Plaintiff, v. the Municipality of Suffolk County,*

*et al.*, No. 11-cv-00911 (JFB) (E.D.N.Y., February 13, 2013) dismissed by Judge Joseph Bianco,

Judge Bianco discusses both Statutes of Limitation and Equitable Tolling, as follows:

> Although "state law supplies the statute of limitations for claims under
> section 1983, federal law determines when a federal claim accrues." *Quiles v.*
> *City of N.Y.*, No. 01 Civ. 10934(LTS)(THIC), 2003 U.S. Dist.LEXIS 14238,
> 2003 WL 21961008, at *5 (S.D.N.Y. Aug. 13, 2003). The clock for such a claim
> begins to run "when the plaintiff knows or has reason to know of the injury
> which is the basis of his action." *Pendleton*, 849 F. Supp. 2d at 329 (quoting
> *Pearl v. City of Long Beach*, 196 F.3d 76, 80 (2d Cir. 2002).

11.     Let's briefly stop right there, and point out that the three government defendants, in their

Motion to Dismiss, have not once touched on the illegality of their November 2005 Zoning Law,

but simply trashed Plaintiff, and used all manner of statutes of limitation. They have claimed

that no court has ever ruled on the legality or illegality of that zoning amendment illegally voted

on 10 November 2005 and then illegally filed as a local law with the New York State Department

of State on 11 November 2005.

12.      True.  But for the obvious two reasons: Until the former mayor gave Plaintiff his files

late in 2009,  Plaintiff had no evidence that (a) the zoning ordinance was illegal; and (b) proof

that it was illegally voted after warning from the Southampton Association's attorney, John Shea.

13.      Also true, that when Plaintiff then brought these illegalities to the attention of the board

of trustees (which knew it anyhow) and to the court, the *Tufo* case in the amended petition and

subsequent claims after 2009, Judge Molia dropped that hot potato like a hot potato and ruled,

instead, on issues Plaintiff had never brought up, while ignoring the issues of Due Process and

Equal Protection which the Plaintiff had brought up.

14.      Furthermore, Plaintiff also brought up the illegal zoning code in her libel suit against

defendant William BROWN, and in that case, not only was the case not fully litigated, but six

judges pointed out in their decision that they had never read any of Plaintiff's 35 exhibits which

Judge Edmead allowed into the case, but refused to read.

### Equitable Tolling

15.      Let's see what Judge Bianco says about equitable tolling of the Statutes of Limitation,

and how his decision in *Jennings* above may apply to *Konrad* at bar.

> Plaintiffs, however, may stop the clock when they can show that
> equitable tolling of their federal claim is warranted.  When equitable
> tolling applies, "the statute does not begin to run until the plaintiff
> ether acquires actual knowledge of the facts that comprise his cause
> of action or should have acquired such knowledge through the exercise
> of reasonable diligence. . . " *Cerbonne v. Int'l Ladies' Garment Workers'*
> *Union*, 768 F.2d 45, 48 (2d Cir. 1985); *Keating v. Carey*, 706 F.2d
> 377, 382 (2d Cir. 1983) (stating "when the defendant fraudulently

-6-

conceals the wrong, the time does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.". . . (equitable tolling) "applies only when plaintiff is prevented from filing despite exercising that level of diligence which could reasonably be expected in the circumstances." *Veltri v. Bldg. Serv. 32B-J Pension Fund,* 393 F.3d 318, 322 (2d Cir. 2004).

16.   Have they admitted their lawlessness?  Of course not.  All the frauds alleged in the

Amended Complaint continue, from defendant ROBINSON's fraudulent claim that 7 So.

Rosko Drive is "adjacent to" and not "in the Rosko Place subdivision," to defendant BROWN's

fraudulent claim to Judge Bianco in September 2012 to escape having been served that his

property at 17 Adams Lane was an "investment property" although he had bragged publicly in his

24 December 2009 letter to the editor that he and his wife were "raising a young family" in their

new house, and defendant GUERIN has not admitted that the map of the subdivision which he

offered to the Village ZBA and to the ARB was a fraudulent, doctored map (see Exhibit 13A to

Plaintiff's Amended Complaint.)  And so it goes.

17.   Judge Bianco addresses equitable tolling in some detail in *Jennings,* as follows:

> , , , we will apply the equitable tolling doctrine 'as a matter of fairness' where a plaintiff has been 'prevented in some extraordinary way from exercising his rights," *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985), we made it clear that we had in mind a situation where a plaintiff 'could show that it would have been *impossible* for a reasonably prudent person to learn' about his or her cause of action."); *Johnson v. Nyack Hosp.*, 86 F.3d 8, 12 (2d Cir. 1996). . . ("[U]nder the doctrine of equitable tolling, a court may, under compelling circumstances, make narrow exceptions to the statute of limitations in order to prevent inequity." (quoting *In re U.S. Lines, Inc.*, 318 F. 3d 432, 436 (2d Cir. 2003)).

18.   Here then, are the reasons why Plaintiff did not bring the separate suit in U.S. Federal

Court – the present suit – until 2012:

19.   In January 2010, Plaintiff hired a libel lawyer to handle her suit against the vile and false

accusations, trumped up by defendant ROBINSON and put into his letter to the editor by co-conspirator and defendant WILLIAM BROWN, whose fraudulent endorsement of the Guerin application (claiming that the Guerin property is not part of the Rosko Place subdivision) is Exhibit 12 to Plaintiff's Amended Complaint.

20.     In Spring 2010, Plaintiff had two operations.

21.     In 2010, Plaintiff also got two tooth implants, which required many visits to various periodontists and other dentists.

22.     In Spring 2010, her City computer crashed.   Coincidentally, her country computer crashed about two to three months later.

23.     On June 5,  2010 (Exhibit 4 to Plaintiff's Amended Complaint, the Police Report), defendant DENIS GUERIN tried to slap Plaintiff, then 81 years old, but hit her on her arm, when she ducked.  He cursed her, saying she was 'the most hated person in the Village," "everybody is praying that you die soon," "you probably killed your husband," "Bitch!  Bitch!" and so on, in front of his then 10-year-old daughter who was about to talk her dog, and kept saying, "Stop, Dadd!"  "Daddy, stop!"

24.     During that Summer, Plaintiff had accidents with three trucks, the last of which, with a Maine license plate, totaled Plaintiff's car.  She had to buy a new one.

25.     A plumber from Hardy, called to check on water in her basement, found that a hose had been put into her basement window and the hose had been turned on the cause the flooding.

26.     Mold was found in the basement, and Plaintiff had to get experts to eliminate the mold, paint the basement, and then, Hardy to install a dehumidifier.

27.     The libel lawyer refused to use Plaintiff's evidence and her reasoning why BROWN had

-8-

attacked her on behalf of ROBINSON and EPLEY and ROBINSON (the latter two quoted very

unflatteringly about Plaintiff in the New York Times article of 10 July 2010 (Exhibit 18 to

Plaintiff's Amended Complaint.)

28.     Judge Edmead's dismissal of Plaintiff's libel suit is a matter of record.  Plaintiff fired the

libel lawyer in November 2010, and took over the lawsuit, making a motion for renewal based on

35 exhibits that her lawyer had failed to use.   Judge Edmead granted submission of the exhibits,

failed to read them, and stuck with her dismissal.

29.     The appeal took time, but Plaintiff tried to get support for a class action or for support

from The Southampton Association, whose lawsuits through a Sag Harbor lawyer had been

soundly defeated in Supreme Court in Riverhead, as Plaintiff had warned them that they would

be.  But by then, defendant Elbert W. Robinson, Epley and Paul Robinson had so dirtied

Plaintiff's name, that Plaintiff was completely ostracized in the Village, old friends no longer

returning her phone calls.

30.     In Spring 2012, Plaintiff was ready to bring the section 1983 in U.S. Federal Court, when

the father of her four children was diagnosed with Stage Three cancer in one lung.  He had a

successful operation.  He had successful chemo throughout the Summer.  On August 12, 2012,

Plaintiff filed in Eastern District Court.

31.     In February 2013, when she returned from a trip as guest in Germany for an occasion

honoring her father, the father of Plaintiff's four children was getting a biopsy.  The result

showed that he now has cancer in both lungs.

### **Continuing Violations**

32.     Until a court of competence, which the U.S. District Court of Eastern New York certainly

is, judges the Village Ordinance of November 2005, judges the violations of Plaintiff's Equal

Protection rights in the lack of personally written notification of public hearings of the ARB,'

judges the horrendous violations of Plaintiff's Due Process rights at the public hearings of the

ARB, judges the vindictive retaliatory actions of the Village Building Department and judges the

lawlessness that makes Plaintiff's life in the Village impossible, all of these injuries and retalia-

tory actions will continue.   For instance, the enormous house at 90 Leo's Lane (an address that

does not exist on the descriptive plat filed by Leo Rosko, Exhibit 3 of P's Amended Complaint)

33.     No need for tolling, because all of the injuries to Plaintiff are continuous.

34.     Some injuries become more acute and more threatening if this case is dismissed, because
it leaves Plaintiff defenseless against unscrupulous opponents.

35.     All of the violations and injuries are interlinked: the government defendants have caused

the violations of Equal Protection, Due Process, and, of course, the violations of the Comprehen-

sive Plan, section 106 calling for Minutes of any meeting with a vote which minutes do not and

did not exist for the vote for the zoning amendment of 10 November 2005 which became law

when filed by Village Attorney Richard DePetris on 11 November 2005.

36.     The government defendants have already profited illegally from their lawlessly voted

local zoning law.

37.     The members of the Epley administration partner with the spec builders in the Rosko

Place subdivision, violating the common plan and scheme, violating the covenants, and violating

Plaintiff's Constitutionally guaranteed rights to First Amendment, Fourteenth Amendment, and

also to the Takings Clause of the Fifth Amendment, because they have appropriated her property

by making it unlivable by her.

-10-

## Choices for the EDNY in This Matter

38.     There is more at stake than the claims filed by Plaintiff in her Amended Complaint.

39.     If the judges of the Eastern District U.S. Court of New York were to dismiss any part of the case at bar, they would be validating a fatally flawed local zoning code which has (1) changed the character of the Village, contrary to the duties of the ARB which is meant to preserve them; (2) condemned the Village to a one-party rule which has been characterized by (a) unjust enrichment (see Exhibit 15 of Plaintiff's Amended Complaint showing 233 signatures on petitions opposing defendant PAUL ROBINSON's application to subdivide two of his corner properties, of which he now has 11; (3) corruption shown by Village procedures favoring boldly and wrongly speculative builders in their efforts to turn this Village into "Queens by the Sea."

40.     Government defendants, Mark EPLEY, former trustee PAUL ROBINSON, and policy-maker ELBERT W. ROBINSON never stopped trashing Plaintiff's reputation as a lawyer, as a citizen, as a resident of the Village.  Now, although Plaintiff attended law school at age 73 and, after earning two degrees (JD and LLM in 2005 and 2006 respectively) passed the bar for New York State in 2007, and was admitted to practice before any court of the State of New York, and before the Southern and Eastern District of the U.S. Courts, but had not spent so much as one day as an "apprentice" or "associate" in a law firm, but suddenly, defendant BROWN, who is surely given legal papers by defendant ELBERT W. ROBINSON JR. while claiming his pro se status, from his profound knowledge of the law, claims that Plaintiff, who is appearing in Federal Court for the first time, at age 84, should be treated by that Federal Court as "an experienced attorney."  Whatever suits the moment, Mr. Brown, right?

41      A lawyer arguing before the U.S. Supreme Court recently told Plaintiff that the main

-11-

difference between the Warren court and the court of Chief Justice Rehnquist was not in the results, but in the methods pursued in arriving at decisions:

     a.     Chief Justice Warren valued a search for justice above technical matters of procedural violations impeding search for truth and justice.

     b.     Chief Justice Rehnquist (plaintiff's undergraduate classmate at Stanford University) stressed the importance of procedural correctness over the search for truth and justice.

42.     The fact that defendants QUINTIN never bothered to (1) answer Plaintiff's September 2011 and March 2012 letters complaining of the damage they were doing to Plaintiff's property; (2) failed to engage in any personal negotations, as suggested by Plaintiff, to help mitigate her continuing damages; and (3) failed to bring their stockade fence down to the legal size until the Building Department, told to do so by Trustee Bill Hattrick, threatened to take away their Certificate of Occupancy if they did not comply, indicates that defendants QUINTIN, knowing they were backed by defendant and ARB and Buildings Department lawyer ELBERT W. ROBINSON JR., did not feel they had to answer their neighbor, Plaintiff or do anything to help her protect her property.

                                         Respectfully submitted,

                                         /s/ Evelyn Konrad
                                       Evelyn Konrad, pro se
                                       Attorney-at-Law
                                       200 East 84th Street
                                       New York, New York 10028
                                       212-585-1240
                                       ek616367@cs.com

-12-